IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WILLIAM HURD,

               Plaintiff,

      vs.

UNION PACIFIC RAILROAD CO.,

               Defendant.

**8:23CV201**

**MEMORANDUM AND ORDER**

This matter is before the Court on Union Pacific's ("U.P.'s") Motion for Summary Judgment (Filing No. 58), U.P.'s Motion for Judgment on the Pleadings (Filing No. 56),[1] William Hurd's ("Hurd's") Motion to Exclude (Filing No. 47), and Hurd's Motion to Strike (Filing No. 69).

Hurd worked at U.P. as a chief utility clerk until 2016, when he was violently assaulted and suffered a traumatic brain injury. Filing No. 1 at 8. U.P. imposed work restrictions, citing Hurd's future risk of seizures associated with the damage to his brain. Id. at 9. Hurd claims U.P. violated the Americans with Disabilities Act ("ADA"). Id. at 2. Because there is sufficient evidence to allow a reasonable jury to conclude: (1) U.P. imposed work restrictions on Hurd because of his "actual or perceived physical or mental

---

[1] U.P. moves for judgment on the pleadings, arguing, in part, Hurd was not actually disabled or on record as having a disability. Filing No. 56. In response, Hurd indicated that he is only proceeding under a "regarded as disabled theory." Filing No. 77; see 42 U.S.C. § 12102(3)(A). Therefore, U.P.'s Motion for Judgment on the Pleadings is granted in part, and the Court will only analyze the Summary Judgment record on a "regarded as" disparate treatment theory. U.P.'s remaining 12(c) arguments are coextensive with its summary judgment arguments and the parties have submitted substantial factual material in connection with U.P.'s for summary judgment. See Hearing v. Minnesota Life Ins. Co., 793 F.3d 888, 893 (8th Cir. 2015) ("Where the movant designates its motion to dismiss alternatively as a motion for summary judgment, and the nonmovant submits materials outside the pleadings, a district court is not required to give formal notice that it will treat a motion as one for summary judgment."). So, under Fed. R. Civ. P. 12(d), the Court converts the remainder of U.P.'s 12(c) motion to a Motion for Summary Judgment under Fed. R. Civ. P. 56 and considers the two motions in tandem under the Rule 56 standard.

impairment" (26 C.F.R. § 1630.2(l)(1)), and (2) the decision was not the result of an "objectively reasonable" "individualized inquiry" "based on the 'most current medical knowledge and/or on the best available objective evidence" (*Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1062 (8th Cir. 2024)), U.P. is not entitled to summary judgment.

Hurd also asks the Court to resolve two issues related to U.P.'s experts. First, he moves to exclude the opinions of Dr. Holland and Dr. Charbonneau because they did not provide expert reports under Fed. R. Civ. P. 26. The Court concludes for Dr. Charbonneau's testimony and most of Dr. Holland's testimony, U.P. complied with its disclosure obligations and, in any event, Hurd has not shown the necessary prejudice to merit exclusion of their testimony. However, Dr. Holland's testimony based on his after-the-fact review of Hurd's medical records is outside the scope of his on-the-job knowledge and ought to have been disclosed via an expert report. The Court concludes tailored exclusion of that testimony is an appropriate sanction for nondisclosure. Second, Hurd moves to strike the declaration of Dr. Hollard from the summary judgment record. This issue is moot because the Court concludes, even considering Dr. Holland's testimony, U.P. is not entitled to summary judgment.

To summarize, U.P.'s Motion for Summary Judgment (Filing No. 58) is denied, U.P.'s Motion for Judgment on the Pleadings (Filing No. 56) is granted in part and converted to a Motion for Summary Judgement in part, Hurd's Motion to exclude (Filing No. 47) is granted in part and denied in part, and Hurd's Motion to Strike (Filing No. 69) is denied.

# BACKGROUND

This is an ADA employment action challenging a railroad's imposition of work restrictions on an employee who suffered head injury because of the employee's heightened risk of seizures.

## A. Hurd Worked for U.P. for a Decade, Ending in the Role of Chief Utility Clerk

At the time of his injury, Hurd was 59 years old and had been working for a decade in railyards in Arizona and California as a utility clerk for U.P., a national railroad. Filing No. 75-2 at 8, Hurd Dep. at 22:9–25:14. At the time of his injury, Hurd worked in the West Colton yard in California, as the chief utility clerk of the Guaranteed Extra Board (a department that ensured there was coverage in the yard when the regular chief utility clerk was unable to work a shift). *Id.* at 8, Hurd. Dep. at 23:18–25; Filing No. 75-1 at 13, Barlow Dep. at 13:6–10. This meant Hurd was paid for 40 hours of work per week, even if he was never called in to work a shift, or as he put it in his deposition, "I got paid to stay home." Filing No. 75-2 at 8, Hurd Dep. at 24:1–9. When he was called in for the shift, Hurd worked in a small office in an administrative building adjacent to the railyard and performed a variety of logistical tasks, including scheduling, paperwork, and distributing supplies to train crews. Filing No. 75-10 (showing the location of the office); Filing No. 75-1 at 6–10 (Hurd's supervisor explaining his duties); Filing No. 75-2 at 9–13 (Hurd explaining his duties). Hurd performed his job well and his supervisor testified that he had the skills and abilities necessary to perform the job. Filing No. 75-1 at 6, Barlow Dep. at 14:20–15:18.

The parties dispute exactly what the chief utility clerk does. They broadly agree that the chief utility clerk was responsible for office work associated with the rail yard,

including completing paperwork for train crews, scheduling transportation for train crews to the train, gathering and distributing supplies, and performing various clerical tasks in the train yard office. *See* Filing No. 75-2 at 12–13, Hurd Dep. at 39:21–43:11; Filing No. 63-6 at 3, Barlow Dep. at 16:8–22. U.P. cites some material in the record indicating the chief utility clerk position was substantially the same as the role of utility clerk. Filing No. 63-4 at 5, Hurd Dep. at 26:6–9. A utility clerk is responsible for driving train crews to and from the train in a company van and performing "yard checks" which consist of walking or driving along a train to verify the number of cars to ensure they are in the proper order. *See* Filing No. 63-8 at 1 (Utility Clerk job description); [2] Filing No. 63-4 at 11, Hurd Dep. at 26:6–17, 76:3–5 (driving); Filing No. 63-6 at 3, Barlow Dep. at 16:18–20 (driving); Filing No. 63-10 at 5, Barba Dep. at 40:1–7 (driving); Filing No. 75-1 at 7, Barlow Dep. at 21:1–10 (yard checks). Hurd frames the chief utility clerk role as more of an office job who rarely, if ever, drove around trains. *See e.g.*, Filing No. 75-2 at 10, Hurd Dep. at 33:18–19 ("As a chief clerk, I did not drive."). Specially, U.P. used a third-party contractor for most of its transportation needs. Filing No. 75-2 at 13, 17–19, Hurd Dep. at 43:12–45:6, 60:10–67:16. If the contractor was unavailable, a utility clerk would drive the train crew and, if they were unavailable, only then, the chief utility clerk would drive. Filing No. 75-2 at 18–19, Hurd Dep. at 64:4–67:11; Filing No. 75-1 at 7, Barlow Dep. at 19:25–20:20. Neither Hurd nor his supervisor could recall any specific instance during Hurd's time as chief utility clerk in which Hurd was responsible for transporting a train crew. Filing No. 75-1 at 7, Barlow Dep. at 20:21–25 ("Q: Okay. And during his actual employment do you

---

[2] The Court notes that the job description for the utility clerk recognizes "[t]here may be position specific differences related to geography, available technology, work force levels, incumbent seniority level, et. which should be clarified in individual situations." Filing No. 63-8 at 1.

have any recollection as to how often that actually happened?  Like, how many times per week he might be required to drive a crew?  A: I don't"); Filing No. 75-2, Hurd Dep. at 66:25–67:16.    Hurd also disputes that the chief utility clerk was responsible for yard checks. Filing No. 63-22.    Basically, U.P. and Hurd agree that the chief utility clerk performs office tasks and may have to drive under certain circumstances but disagree about the frequency of driving and its importance to the chief utility clerk role.

### B. Hurd is Assaulted and Treated for a Head Injury

In 2016 Hurd was the victim of a brutal assault.  A group of people kicked and punched Hurd across the body and head, dragged him across the ground, and beat him using a glass bottle.  Filing No. 75-2 at 22–25, Hurd Dep. at 80:20–88:5, 91:1–6.  The attack left Hurd unconscious.  Filing No. 63-30 at 1.  EMTs rushed Hurd to the hospital.

On arrival, Hurd's treating physicians observed a black eye, multiple facial lacerations, and was bleeding from the nose and ears.  Filing No. 76-2 at 23.  A CT scan taken shortly after the attack which showed multiple facial fractures, bleeding in the space between the brain and the skull (subarachnoid and subdural hemorrhages), cerebrospinal fluid buildups in the brain and ear, and gas buildups in the skull (pneumocephalus).  Filing No. 63-14 at 2–3.  Based on these observations, the treating physicians diagnosed Hurd with cerebrospinal fluid leak, traumatic brain injury, skull fractures, and facial fractures.  Filing No. 63-18 at 1–2 (summarizing the diagnoses made by Hurd's treating physicians).  Dr. Diesing (U.P.'s medical expert) and Dr. Trangle (Hurd's medical expert) agree that the combined presence of gas within the skull and cebrospinal fluid in the ear may suggest that Hurd suffered a tear in the dura (the protective covering around the brain) during the

5

attack but this diagnosis does not appear in Hurd's medical records.[3] Filing No. 63-18 at 4 (Diesing report); Filing No. 63-12 at 8, Trangle Dep. at 62:17–23. The experts likewise agree Hurd suffered some loss of brain tissue because of the attack. Filing No. 63-18 at 4 (Diesing); Filing No. 63-25 at 12–13 (Trangle). Hurd was discharged home after spending a week in the hospital. Filing No. 76-1 at 157. He did not suffer a seizure while hospitalized. Filing No. 76-2 at 127.

After discharge, the treating physicians continued to monitor Hurd's injuries. A follow up CT scan showed continued presence of cerebrospinal fluid (bilateral subdural hygromas) around Hurd's brain. Filing No. 63-29 at 1. The treating physician also observed portions of the imaging consistent with encephalomalacia, or loss of brain tissue. Id. Follow up imaging taken six, nine, and ten months later showed Hurd's brain injuries had resolved, save for the loss of brain tissue. Filing No. 76-1 at 365; Filing No. 76-5; Filing No. 76-6.

Hurd experienced other symptoms during his recovery period including confusion, severe headaches, short term memory loss, severe facial pain, tingling in the face, and hearing loss. Filing No. 63-30 at 1 (detailing symptoms a month after the attack). An ear nose and throat doctor determined that Hurd's hearing difficulties were caused by a ruptured eardrum and broken bone in the inner ear and performed surgery to address the issues. Filing No. 63-31; Filing No. 63-2 at 2; Filing No. 63-33 at 1.

---

[3] U.P. does not rely on the dural tear as the primary justification for Hurd's seizure risk. Instead, their expert's opinion relies on the totality of Hurd's injuries including the hemorrhages and cranial contusions. Filing No. 63-18 at 5 ("This does not take into account the increased risk attributed just to skull fractures, rupture of the dura, pneumocephalus, and a loss of consciousness . . .. These added risks are not discussed in detail here because they are overshadowed by the documented risks associated with a traumatic brain contusions and hemorrhages.").

While Hurd recovered from his injuries, U.P. placed him on a medical leave of absence. Filing No. 76-1. Five months after discharge, Hurd's treating physicians agreed Hurd could return to work. Hurd's primary physician opined he had "no significant lingering residual cognitive, emotional or physical defects." Filing No. 76-4 at 3. His ear nose and throat doctor and neurologist agreed. Filing No. 76-1 at 69 (Hurd's ear nose and throat surgeon); *id.* at 312 (Hurd's neurologist). So, Hurd began the process of returning to work.

### C. U.P. Determines Hurd Cannot Return to the Chief Utility Clerk Position

Before Hurd could return to work, U.P. required him to undergo a "fitness-for-duty evaluation." *See* Filing No. 62-1 (explaining the background of U.P.'s current fitness-for-duty evaluations); Filing No. 62-6 (U.P.'s seizure-related medical standards). Hurd was subject to a fitness-for-duty evaluation because he suffered a qualifying head injury under U.P.'s medical rules. *See* Filing No. 62-6, U.P.'s Medical Standards for Safety. During a fitness-for-duty evaluation, U.P.'s medical officer reviews the medical records of an employee to determine whether the employee poses a safety risk to the employee, her coworkers, or the public. Filing No. 62-1 at 5–6, ¶ 18.

Dr. Charbonneau, an occupational physician employed by U.P., completed Hurd's fitness-for-duty evaluation. Filing No. 63-24. Hurd submitted the records from his hospitalization and subsequent treatment. Filing No. 63-22 at 11. U.P. requested additional neurology records, including MRI or EEG reports. *Id.* at 13. Hurd informed U.P. that he did not possess any additional records and did not undergo an MRI or EEG while hospitalized. *Id.* at 14.

Dr. Charbonneau concluded Hurd could not return to work without restrictions. His explained his decision in a "HMS Memo on Fitness for Duty Determination" (the FDD Memo). Filing No. 63-24. First, Dr. Charbonneau explained the background of Hurd's injury, his diagnoses, and subsequent treatment. Id. at 1–2. Then, in the assessment section of the FDD Memo, Dr. Charbonneau wrote:

> William Hurd is a Guaranteed Extra Board – Utility worker and he sustained multiple skull and facial bone fractures and a severe traumatic brain injury during an assault. He experienced multiple sites and types of intracranial bleeding including subarachnoid, subdural, and intra-parenchymal (within the brain tissue) bleeds. He had persistently impaired cognitive function after his injury and has developed chronic intracranial fluid collections (hygromas) and post-traumatic brain tissue loss in the left frontal lobe. Severe traumatic brain injuries with intraparenchmal hemorrhages and resultant loss of brain tissue are associated with a permanently unacceptably high risk of additional neurologic episodes, including seizures. Peer-reviewed medical guidelines, such as those from the Federal Motor Carrier Safety Administration (FMCSA),[4] recommend permanent restrictions from safety-sensitive activities. Mr. Hurd will require permanent sudden incapacitation restrictions, as the risk of sudden incapacitation does not decrease with time.

Id. at 2. Based on this conclusion, Dr. Charbonneau imposed permeant work restrictions. Id. Relevant to Hurd's prior work for U.P., he was no longer permitted to "operate company vehicles, on-track or mobile equipment, or fork-lifts," or "transport train crews." Id.

---

[4] This refers to guidance issued by the Federal Motor Carrier Safety Administration for use by medical examiners in the trucking industry who certify truckers for commercial drivers' licenses. In the guidance, the agency reviewed the medical literature and offered recommendations on how to account for the risk of certain common medical conditions. See generally Filing No. 62-4. Relevant here, the FMCSA recommends a one year waiting period for subarachnoid hemorrhages (without seizures), a two-year waiting period for a moderate head injury, involving loss of consciousness (without seizures), and no certification for a severe TBI, involving penetration of the dura. Id. at 10–12. The agency reasoned such injuries create a lifelong heightened risk for seizures. Id. at 10. While FMCSA contemplated that this guidance would be updated frequently, it has not been updated since 2015. See id. at 4. Instead, the agency removed it from its website because "the content is not in line with the current regulations and therefore is not endorsed by the Agency for use." 83 Fed. Reg. 40,641, 40,641 (Aug. 15, 2018).

Hurd's supervisors understood the restrictions outlined in the FDD Memo as constructing an insurmountable barrier to Hurd's return to the Chief Utility Clerk role. U.P. provided a copy of Hurd's work restrictions to the managers of the West Colton yard. Filing No. 63-26. The next day, the managers responded that the restrictions would interfere with Hurd's essential job functions as a chief utility clerk. *Id.* They also determined no reasonable accommodations could be provided to allow Hurd to perform his essential job functions. *Id.* The managers did not speak to Hurd about his medical condition or specific job duties before determining he could not be accommodated. Filing No. 75-3 at 10, Barba Dep. at 32:11–24; Filing No. 75-1 at 14, Barlow Dep. at 47:12–16 ("Q: Prior to answering that, did you ever speak to Mr. Hurd about how often he was actually required to drive a crew in this chief utility clerk position? A: No, I did not.").

Hurd was informed of the results of his fitness-for-duty evaluation a week later. Filing No. 63-22 at 15. He did not return to any role at U.P. Since then, Hurd continues to work, including jobs involving driving, and holds a driver's license. Filing No. 75-2 at 44, Hurd Dep. at 166:8–167:25; Filing No. 75-14 at 2, ¶ 4.

### D. Hurd Sues and the Experts Disagree About the Level of Risk Created by Hurd's Injuries

In 2023, Hurd sued, alleging U.P. violated the ADA when it imposed work restrictions. Filing No. 1. In litigation, the medical experts disagree about the level of workplace risk posed by Hurd's brain injury.

Dr. Diesing, U.P.'s neurologist opined that the brain bleeds and blunt force impact between the brain and the skull caused "permanent irreversible structural and connectivity changes." Filing No. 63-18 at 4. These changes "result in an increased risk of epileptic seizures." *Id.* Specifically, the medical literature shows that patients who suffered similar

head injuries showed a significantly heightened risk of seizures. *Id.* at 4–5 (collecting studies showing between a 12-fold and 43-fold increase in seizure likelihood compared to the general population). Overall, Dr. Diesing concluded Hurd "carries a significant risk for epileptic seizures and sudden incapacitation up to and even beyond 10 years from his injury" and "Union Pacific was reasonable in issuing permanent restrictions in Mr. Hurd's case." *Id.* at 6. Dr. Diesing also opined it was appropriate for U.P. to use the FMCSA guidelines to assess Hurd's risk. *Id.* at 5–6.

Dr. Trangle, Hurd's expert, disagrees. In his opinion, the medical review of Hurd's case was inadequate, and Hurd was safe to return to work for five reasons. Filing No. 63-25 at 32. First, Dr. Charbonneau improperly relied on the FMCSA handbook because it is based on outdated medical information, was never intended to be a "prescriptive regulatory document," and was withdrawn by the agency. *Id.* at 33. Second, Dr. Charbonneau erroneously characterized Hurd's head injury as a severe rather than moderate TBI, leading him to impose permeant, rather than temporary work restrictions. *Id.* Third, given that Hurd has not suffered a seizure in the years after his head injury, he has the same risk of seizures as the average person or, at the very least, a level of risk below U.P.'s one percent cutoff. *Id.* at 34. Fourth, Dr. Charbonneau's opinion incorrectly assumed Hurd's work involved driving, when it did not, leading to an inaccurate assessment of the risks posed by any potential seizures. *Id.* at 34–35. Fifth, Hurd's treating physicians found that he had returned to baseline functioning and could return to work with no restrictions. *Id.* at 15–16.

U.P. now moves for summary judgment.

10

### E. The Parties' Disputes Over Expert Disclosure

During this litigation, the parties have reached an impasse regarding the sufficiency of U.P.'s expert disclosures. The dispute involves Dr. Charbonneau, the doctor who performed Hurd's fitness-for-duty evaluation, and Dr. Holland, the doctor who designed and oversaw U.P.'s fitness-for-duty process during the relevant period.

Dr. Charbonneau was identified as a potential witness by both parties. Filing No. 49-1 at 4 (Hurd); Filing No. 49-2 at 4–5 (U.P.). U.P. disclosed Dr. Charbonneau as an expert writing:

> Dr. Charbonneau is an Assistant Medical Director at Union Pacific. He is expected to testify regarding his knowledge of Union Pacific's fitness-for-duty policies and procedures as well as his involvement in the Plaintiff's fitness-for-duty evaluation, including his review of Plaintiff's medical records and health information consistent with his findings as stated in the Plaintiff's Medical Comments History and other documents produced in this case. Dr. Charbonneau is also expected to testify regarding his diagnosis and opinions about Plaintiff's health condition, the restrictions placed upon Plaintiff by Union Pacific, and the underlying rationale for those restrictions.

Filing No. 49-3 at 3. U.P. produced the FDD memo and Hurd's internal file collecting Dr. Charbonneau's clinical impressions. *See* Filing No. 63-24; Filing No. 76-1. Hurd deposed Dr. Charbonneau' about his conclusions. *See* Filing No. 75-11.

Dr. Charbonneau no longer works for U.P. but U.P. pays him for time spent in litigation. Filing No. 49-6 at 19–25, Charbonneau Dep. at 18:22–24:24. He did not produce a written expert report. *Id.* at 19, Charbonneau Dep. at 18:4–10.

Dr. Holland was named a witness by both parties. Filing No. 49-1 at 4 (Hurd); Filing No. 49-2 at 4 (U.P.). U.P. disclosed Dr. Holland as an expert witness, writing:

> Dr. Holland is the former Chief Medical Officer of Union Pacific. He is expected to testify regarding his knowledge of Union Pacific's fitness-for-duty policies and procedures as well as his involvement in the Plaintiff's fitness-for-duty evaluation, review of Plaintiff's medical records and health

> information, and his findings as stated in the Plaintiff's Medical Comments History and other documents produced in this case. Dr. Holland is also expected to testify regarding his diagnosis and opinions about Plaintiff's health condition, the restrictions placed upon Plaintiff by Union Pacific, and the underlying rationale for those restrictions.

Filing No. 45-4 at 2–3. He designed the fitness-for-duty rules and procedures applied by Dr. Charbonneau in Hurd's case. Filing No. 62-1. But Dr. Holland's role in Hurd's case was minimal. Dr. Holland testified Dr. Charbonneau was the decisionmaker in Hurd's case. *See* Filing No. 49-5 at 14–15, Holland Dep. at 13:23–14:2. Dr. Holland did not leave any notes in Hurd's file. *See* generally Filing No. 50-1. One of the notes from Dr. Charbonneau suggests that he planned to speak with Dr. Holland regarding the case, but Dr. Holland testified at his deposition that had no independent recollection of that conversation or the details of Hurd's case. *Id.* at 12–13 (note in Hurd's file); Filing No. 49-5 at 11, Holland Dep. at 10:6–12 ("Q: . . . Prior to reviewing the documents that you looked at in preparation for your deposition, did you have any recollection of Mr. Hurd's fitness-for-duty process back in 2016, 2017? A: So, I don't have any independent recollection of this case, no."); *id.* at 11, Holland Dep. at 11:17–21 ("Q: And you don't have any recollection of actually having any discussion with Dr. Charbonneau about Mr. Hurd's fitness-for-duty determination; is that accurate? A: That's accurate, yes."). Instead, he familiarized himself with Hurd's records in preparation for his deposition. *Id.* at 8–11, Holland Dep. at 7:11–10:12. Dr. Holland did not produce a written report. *Id.* at 17, Holland Dep. at 16:5–8. U.P. included a declaration from Dr. Holland that explained U.P.'s fitness-for-duty procedures in support of its Motion for Summary Judgment but the declaration did not discuss the specifics of Hurd's case. Filing No. 62-1.

Hurd now moves to exclude or limit Dr. Charbonneau's testimony and to exclude or strike Dr. Holland's testimony.

## LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celotex Corp., 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Celotex Corp., 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury

to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

### B. Rule 26(a)(2)

*Fed. R. Civ. P. 26(a)(2)* sets disclosure requirements for expert witnesses. The rule distinguishes between "a witness who is . . . retained or specially employed to provide expert testimony in a case" and fact witnesses with personal knowledge of the case who possess expert knowledge. *Fed. R. Civ. P. 26(a)(2)*. A retained witness must provide a written report that meets the requirements listed in *Fed. R. Civ. P. 26(a)(2)*. On the other hand, this second category of "hybrid witnesses" need only disclose, "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the witness is expected to testify." *Fed. R. Civ. P. 26(a)(2)(C)*–(D). Failure to timely or properly disclose triggers sanctions but the district court "has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case when a party fails to provide information or identify a witness in compliance with *Rule 26(a)*." *Gruttemeyer v.*

14

*Transit Auth.*, 31 F.4th 638, 644–45 (8th Cir. 2022).  The Court's discretion is guided by "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony."  *Id.* (*quoting Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008)).  "[E]xclusion of evidence is a harsh penalty and should be used sparingly."  *Id.* at 645.

## DISCUSSION

The Court first addresses U.P.'s Motion for Summary Judgment and then moves to the expert witness disclosure issues.

### A. U.P.'s Motion for Summary Judgment, Filing No. 58

Summary judgment is inappropriate because there are disputes of material fact on Hurd's disability discrimination claim and U.P.'s direct threat defense.  Specifically, a reasonable jury could conclude: (1) U.P. regarded Hurd as disabled, (2) Hurd was able to perform the essential functions of the chief utility clerk role, and (3) U.P. terminated Hurd because of his perceived disability.  Likewise, a reasonable jury could conclude that U.P.'s direct threat determination was not individualized, objectively reasonable, or based on the best available objective evidence.  So, those questions must be resolved by the jury not the Court.

#### 1. Hurd's Disability Discrimination Claim

U.P. is not entitled to summary judgment on Hurd's disability discrimination claim because there are disputes of material fact on each element.  The ADA's "sweeping purpose" is to "eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."  *PGA Tour, Inc. v. Martin*, 532

15

U.S. 661, 675 (2001). The ADA prohibits an employer from "discriminat[ing] against a qualified [employee] on the basis of disability." 42 U.S.C. § 12112(a). To prove a claim for disability discrimination Hurd must show: (1) he is disabled, (2) he is qualified to perform his job, and (3) U.P. discriminated against him because of disability. *Id.*; *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1060 (8th Cir. 2024). Hurd is proceeding under a "regarded as" disabled theory. "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

### a. Regarded as disabled

A reasonable jury could decide U.P. regarded Hurd as disabled because they regarded him as having lasting damage to the brain—i.e., a condition affecting Hurd's neurological system. U.P.'s proposed distinction between the injury itself and the risk of future seizures is inconsistent with the ADA and its implementing regulations and overreads Eighth Circuit case law.

### i. Legal framework

Hurd is disabled under the ADA if U.P. "regarded [Hurd] as having . . . an impairment." 42 U.S.C. § 12102(1)(C). "Physical or mental impairment means . . . [a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological." 29 C.F.R. § 1630.2(h). An individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does

16

ultimately establish, a defense to such action. *Id.* at § 1630.2(l)(2). "To illustrate how straightforward application of the 'regarded as' prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability." 29 C.F.R. § 1630.2(l).

### ii.    U.P. regarded Hurd as having a physiological disorder or condition affecting the neurological system of the body

There is evidence in the record that U.P. regarded Hurd as having a physical impairment. An impairment is "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological." 29 C.F.R. § 1630.2(h); *Sanders*, 108 F.4th at 1060. For example, in *Sanders*, evidence that U.P. "was concern[ed] that Sander's heart was impaired" was enough to show a perceived disorder affecting the cardiovascular system. *Sanders*, 108 F.4th at 1060–61. Here, the effects of the TBI mark the physical structure of Hurd's brain and create a heightened seizure risk. Indeed, in the FDD Memo cites Hurd's loss of brain tissue during the injury or, in other words, a physical feature of Hurd's brain caused by Hurd's injury. And Dr. Diesing, U.P.'s expert opined Hurd's injuries "cause[d] permanent neuronal damage to the underlying brain tissue" and "an irreversible structural and connectivity change within the neuronal tissue that remains for the life of the individual." Filing No. 63-18 at 3–4. He further opined that an MRI of Hurd's brain showed "permanent irreversible structural and connectivity changes . . . "result[ing] in an increased risk of epileptic seizures." *Id.* So, Hurd's loss of brain tissue is a physiological condition affecting the neurological body system and, thus, falls within the protective scope of 29 C.F.R. § 1630.2(h). "Based on this evidence that Union Pacific perceived [Hurd] as having a [brain] impairment and restricted him from work on that

basis, a reasonable jury could conclude that the railroad regarded [Hurd] as being disabled." *Sanders*, 108 F.4th at 1061.

### iii.    U.P.'s arguments

Resisting this commonsense conclusion, U.P. raises two arguments.   First, it argues that the "regarded as" definition only accounts for situations in which an employer's decision implicates "archaic attitudes, erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities" which is not implicated by the medical decision making here.  Filing No. 61 at 13 (quoting *Pittari v. Am. Eagle Airlines, Inc.*, 468 F.3d 1056, 1063 (8th Cir. 2006)).   Second, it argues that did not regard Hurd as disabled but rather acted based on Hurd's risk of future seizures.   The Court disagrees with U.P. on both points.

The Eighth Circuit specifically rejected U.P.'s first argument in *Sanders*.   There, like here, U.P. argued, based on the same cases cited here, "restrictions based on the recommendations  of a physician could not establish a perception of disability" because "the 'regarded as' provision of the statute was designed to combat 'archaic attitudes, erroneous perceptions, and myths,' and a doctor's report does not suffer from those infirmities."  108 F.4th at 1061.    The Eighth Circuit disagreed because "The ADA Amendments  Act of 2008 . . .  superseded  the cited decisions."[5]   *Id.*   Reviewing the

---

[5] ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008).  Specifically, these amendments added the current definition of "regarded as" codified at 42 U.S.C. § 12102(3)(A) and added a rule of construction that disability "shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."  Pub. L. 110-325 § 3.  It also included a rulemaking provision that instructed the EEOC to promulgate regulations implementing the definitions of disability in section 3 (including rules of construction). *Id.* at § 506.  In response, the EEOC promulgated the operative definition of impairment codified at 29 C.F.R. § 1630.2(h). *See* Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, as Amended, 76 Fed. Reg. 16,978, 17,000 (Mar. 25, 2011).  Congress also criticized and superseded the Supreme Court's decision in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999) which required, in a "regarded as" case, "a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment

amended statute, the court concluded "[t]he amended text provides no basis to limit the prohibition to discrimination based on 'archaic attitudes, erroneous perceptions, and myths.'" *Id.* So, here, like there, "Dr. Charbonneau's recommendation thus does not insulate [U.P.] from liability." 108 F.4th at 1061.

U.P.'s second argument fares no better. *Citing Morriss v. BNSF Ry. Co.*, 817 F.3d 1104 (8th Cir. 2016). U.P. argues that the Eighth Circuit "distinguishes between an employer's belief that an employee has a physical impairment versus a predisposition to future health risks." Filing No. 61 at 14. The Court disagrees for three reasons.

*First*, U.P. overreads *Morriss*. Contrary to U.P.'s assertion, *Morriss* did not establish that am employer does not act based on an employee's impairment when they act based on the employee's future safety risk. There, the court rejected a "regarded as" ADA claim brought by an obese prospective railroad worker. *Morriss*, 817 F.3d at 1106. The court reasoned weight is a physical characteristic, like height or eye color, that, unless caused by an underlying condition or disorder, falls outside the ADA's definition of impairment. *Id.* at 1108.[6] Because the plaintiff's obesity was not an impairment, the railroad was free to consider it, along with future disabling health risks, in declining to employ him. *Id.* at 1113.[7] The upshot of *Morriss* is so long as an employee does not have

---

that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting" and noted these mistakes often stemmed "from stereotypic assumptions." Pub. L. 110-325 § 2(a)(4). These amendments "expanded the scope of 'regarded as' claims." *Sanders*, 108 F.4th at 1061.

[6] The EEOC's interpretive guidance make a similar point. 29 C.F.R. Pt. 1630 app. § 1630.2(h) ("It is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural, and economic characteristics that are not impairments. The definition of the term 'impairment' does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight, or muscle tone that are within 'normal' range and are not the result of a physiological disorder.")

[7] This is consistent with EEOC guidance providing "the definition of [impairment] . . . does not include characteristic predisposition to illness of disease." *Id.* at 1113 (quoting 29 C.F.R. § 1630.2(h)). So, for example, if an employee had a genetic predisposition to heart disease had not physically manifested in cardiovascular system, it is not an impairment under the ADA. *See Frith v. Warner Bros. Discovery, Inc.*, 2025 U.S. Dist. LEXIS 2314 at *7-10 (S.D. Tex. Feb. 10, 2025).

an existing impairment, a railroad is allowed to make employment decisions based on the risks created by their physical characteristics including actuarial risk of future health events. Not so here.

Hurd's brain damage is entirely different from the obesity at issue in *Morriss*. While one can comfortably speak about a person's physical characteristics like height, weight, and shoe size, one does not similarly speak of the person's height, weight, shoe size, and brain lesions. So, here, unlike there, U.P. did not act on future actuarial risk untethered to an existing impairment but, rather acted on the risks associated with an existing impairment. *Morriss* insulates the former, not the later.[8]

*Second*, because Hurd's brain injury is an impairment, U.P.'s distinction between perceiving Hurd as disabled and acting based on future safety risk, runs headlong into the Supreme Court's decision in *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273 (1987) *superseded by statute in part by* REHABILITATION ACT AMENDMENTS OF 1992, PL 102–569, October 29, 1992, 106 Stat 4344. There, like here, the defendant attempted to draw a distinction between an impairment and the effects of an impairment. Specifically, a school district fired a teacher for having a flareup of chronic tuberculosis but argued it did not violate the ADA because it was acting based concerns that the condition posed a threat to others. *Sch. Bd. of Nassau County, Fla.*, 480 U.S. at 281. The Supreme Court disagreed that "the contagious effects of a disease can be meaningfully distinguished from the disease's physical effects on a claimant" because

---

[8] The same is true for other circuit level authority cited by U.P., which involved physical characteristics associated with a heightened actuarial risk for a recognized impairment. *See Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 335 (7th Cir. 2019) (obesity with a heightened risk of developing diabetes); *Chancey v. BASF*, No. 23-40032, 2023 WL 6598065, at *2 (5th Cir. Oct. 10, 2023) (refusal to receive the COVID-19 vaccine with a heightened risk of developing COVID). Neither case involved existing brain damage or similar impairment.

plaintiff's "contagiousness and her physical impairment each resulted from the same underlying condition, tuberculosis." *Id.* at 282. Holding otherwise would allow an employer to "unfair[ly]" "seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment." *Id.* Here, the perceived impairment (Hurd's brain damage) and the risk to others (the heightened possibility of a stroke) come from the same underlying injury. So, under *Nassau County*, the Court cannot treat them as separate.

*Third*, U.P.'s proposed allocation of proof flouts Congress's intent in recognizing the direct threat defense. Specifically, Congress provided that an individual is "regarded as disabled" when "he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Notably, Congress did not include any language in § 12102(3)(A) requiring the employee not pose any danger to their coworkers or the public to be regarded as disabled. Instead, Congress accounted for the employer's interest in workplace safety by providing "[i]t may be a defense to a charge of discrimination under this act" if the plaintiff "pose[s] a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(a)– (b). This balance, of considering U.P.'s safety rationale when considering whether Hurd posed a direct threat—not whether U.P. is regarded as disabled—is supported by EEOC's implementing and interpretive regulations. Specifically, the EEOC recognizes, "[a]n individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment,

even if the entity asserts, or may or does ultimately establish, a defense to such action."

42 C.F.R. § 1630.2(I)(2). The interpretive guidance spells it out even more clearly:

> Whether a covered entity can ultimately establish a defense to liability is an inquiry separate from, and follows after, a determination that an individual was regarded as having a disability. Thus, for example, an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled. Whether the employer has a defense (e.g., that the employee posed a direct threat to himself or coworkers) is a separate inquiry.

29 C.F.R. Pt. 1630 app. § 1630.2(I). Congress structured the ADA by broadly prohibiting U.P. from discriminating against Hurd based on perceived disability, but allowing U.P. to assert a defense based on the risks posed by Hurd in the workplace. Text, structure, and implementing regulations all show that considering U.P.'s safety rationale at this stage would turn the order of proof envisioned by Congress on its head.

To summarize: a reasonable jury could conclude that U.P. regarded Hurd as disabled because they imposed work restriction based on Hurd's brain damage. The fact that U.P. relied on the opinion of Dr. Charbonneau does not shield them from liability on a "regarded as claim." U.P.'s purported seizure risk is caused by the same physical and chemical changes to the brain after the assault, so the Court cannot treat the risk and the impairment separately, and must, consistent with Congress's scheme, analyze the risk as part of U.P.'s direct threat defense.[9]

---

[9] For these reasons, the Court does not follow U.P.'s primary district court authority. Specifically, *Bingham*, *Jackson*, and *Mesa* overread *Morriss* and (perhaps due to how the cases were litigated) failed to grapple with the connection between heightened risk of seizures and the physical changes to the brain after a stroke, i.e., a physiological condition affecting the neurological system. *See Bingham v. Union Pac. R.R. Co.*, 693 F. Supp. 3d 1033, 1052–53 (D. Neb. 2023) (relying on *Morriss* without addressing the medical cause of the heightened sudden incapacitation risk); *Jackson v. Union Pac. R.R. Co.*, No. 4:19-CV-00069-RGE-RAW, 2021 WL 1726895, at *13 (S.D. Iowa Mar. 29, 2021) (focusing on impairments in other body systems); *Meza v. Union Pac. R.R. Co.*, No. 8:22CV102, 2024 WL 754738 (D. Neb. Jan. 26, 2024), *9n.4 (D. Neb. Jan. 26, 2024) (criticizing plaintiff for not "address[ing] Union Pacific's distinction between a current

### b. Qualified to perform the job

A reasonable jury could conclude Hurd was qualified to perform his job. There is a dispute of material fact about whether driving is an essential function of Hurd's job. Even considering driving, Hurd performed the job successfully in the past, his supervisor opined he was a good employee, and there is nothing in the record suggesting his injuries rendered him incapable of driving. While U.P. contends he could not safely drive, Congress intended for that concern to be addressed at the direct threat stage.

### i. Legal framework

The ADA only prohibits discrimination against "a *qualified* individual on the basis of disability." 42 U.S.C. § 12112(a) (emphasis added). A qualified individual is one who possesses "the requisite skill, experience, education and other job-related requirements" of the job and "with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.1(m). Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires" but not "the marginal functions of the position." *Id.* at § 1630.1(n)(1). Whether a function is essential is a "fact-intensive issue, which turns on factors such as the employer's judgment, its written job description, the terms of any applicable collective bargaining agreement, and the consequences of not requiring the incumbent to perform the function." *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 941 (8th Cir. 2018) (en banc); *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 634 (7th Cir. 2020) (recognizing

---

physical impairment and the potential risk of future health issues" but noting "[t]hat is not to say the Court finds all or even most of Union Pacific's legal arguments persuasive, or that the Court agrees —to the extent it applies at all in these circumstances—with the reasoning in Union Pacific's cited cases.").

"[w]hether a function is essential is a question of fact, not law" and reversing a grant of summary judgment).[10]

### ii. A Reasonable Jury Could Find Hurd is Qualified for the Chief Utility Clerk Position

Generally, the parties do not dispute that Hurd had the training and experience to work as a Chief Utility Clerk. Indeed, his supervisor testified that he was a good employee with the skills needed to perform the functions of the job. Filing No. 75-1 at 6, Barlow Dep. at 14:20–15:18. Instead, the parties dispute centers on the utility clerk's role of driving train crews in a company van.

As a preliminary matter, there is a dispute of material fact about whether driving was an essential function of Hurd's job. To determine whether a function is essential the Court considers "[t]he employer's judgment as to which functions are essential," any written job description, "[t]he amount of time spent on the job performing the function," and the work experience of those performing the role. 29 C.F.R. § 1630.2(n)(3). "Although courts 'usually do not second-guess the employer's judgment in describing the essential requirements for the job' that 'deference is not unqualified.'" *Baker v. Union Pac. R.R. Co.*, 580 F. Supp. 3d 647, 658 (D. Neb. 2022) (quoting *Mlsna*, 975 F.3d at 634). Here, U.P. contends that transporting train crews is an essential function of the chief utility clerk job. Even affording appropriate deference to U.P.'s judgment, a reasonable jury could conclude otherwise. Specifically, U.P. did not produce a written job description for

---

[10] Specifically, EEOC regulations require the Court to consider: "(i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).

the chief utility clerk but, rather, relies on the job description for the utility clerk position. Filing No. 63-8 at 1. That generic description states that a utility clerk may perform different duties depending on location and seniority. *Id.* Thus, a reasonable jury could conclude based on Hurd's location and seniority, that only a subset of the duties in the generic description applied to the Chief Utility Clerk. Indeed, Hurd's testimony and statements made throughout the fitness for duty process show that, while he drove when he worked as a utility clerk, the chief utility clerk job was almost entirely a desk job. Filing No. 63-22 at 26–27 ("My main position is a Chief Clerk and I just sit [in] an office, no driving required."); Filing No. 75-2 at 10, Hurd Dep. at 33:18–19; *id.* at 38, Hurd Dep. at 144:6–14; *id.* at 13, Hurd Dep. at 43:11; *id.* at 14, Hurd Dep. at 46:3–4; *id.* at 21, Hurd Dep. at 76:18–77:5 (similar). And neither Hurd nor his supervisor could testify with any specificity whether or how often Hurd drove. Indeed, when asked about it during his deposition, Hurd could not recall any specific instance during his time as chief utility clerk where he drove a company vehicle to transport a crew or perform a yard check. Filing No. 75-2, Hurd Dep. at 66:25–67:16. Buttressing this conclusion, the record shows multiple layers of people (including independent contractors and other utility clerks) would need to be unavailable for Hurd to drive a company vehicle. *See* Filing No. 75-2 at 18–19, Hurd Dep. at 64:4–67:11. Based on this evidence, a reasonable jury could conclude that driving was not an essential function of the Chief Utility Clerk role, notwithstanding U.P.'s judgment that it was.

Even assuming driving is an essential function, a reasonable jury could decide Hurd was qualified to perform his job as chief utility clerk. A "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential

functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Sanders*, 108 F.4th at 1061. For example, in *Sanders*, the employee showed he was a qualified to "perform strenuous labor" by showing: (1) testimony that he "could lift knuckles and perform other strenuous activities without accommodation," (2) evidence that his doctor's cleared him to return to work with no lifting restrictions, and (3) the absence of any test showing he was unable to lift the required amount. *Sanders*, 108 F.4th at 1061. Here, Hurd's doctors cleared him to return to work with no restrictions, including restrictions on driving. Filing No. 76-4; Filing No. 76-1 at 69; *id.* at 312. Hurd maintains a driver's license and has continues to work jobs involving driving. Filing No. 75-2 at 44, Hurd Dep. at 166:8–167:25; Filing No. 75-14 at 2, ¶ 4. U.P. failed to show any evidence that Hurd is legally or functionally unable to drive a vehicle. *Clark v. Lyman-Richey Corp.*, No. 8:06CV669, 2008 WL 1733603, at *8 (D. Neb. Apr. 10, 2008) (holding there is no ADA liability for discharge of an epileptic truck driver who was fired because he could not hold a commercial driver's license, a requirement of the job). So, a reasonable jury could conclude Hurd is a qualified individual.

### iii.    U.P.'s Arguments

U.P.'s counter arguments, at best, demonstrate a dispute of material fact and, at worst, are inappropriate for this stage of the analysis.

*First*, U.P. argues that Dr. Trangle agreed work restrictions were appropriate, but this argument relies on an unduly selective reading of the report. Certainly, the "ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden." *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003). But here each of Hurd's physicians cleared him to return to work with no

restrictions, including driving restrictions. Filing No. 76-4; Filing No. 76-1 at 69; *id.* at 312. The section of Dr. Trangle's report cited by U.P. does not show otherwise. Specifically, Dr. Trangle's primarily conclusion was Hurd's job was an office job and *any* work restrictions were inappropriate. Filing No. 63-25 at 34. Alternatively, even if U.P.'s work restriction framework applied, Dr. Trangle concluded U.P. misclassified Hurd's head injury. *Id.* at 33. This secondary conclusion in an expert report does not entitle U.P. to summary judgment, at best, it shows a basis for a dispute of material fact.

*Second*, U.P. argues Hurd's heightened seizure risk rendered him too risky to drive but, consistent with the structure of the ADA, the Eighth Circuit has rejected U.P.'s contention and addressed these concerns at the direct threat stage. Specifically, as noted *supra* Section A.1.a.iii., pp. 17–22, Congress allowed for consideration of an employer's interest in safety by recognize a direct threat defense to liability, not by requiring the employee to prove they pose no danger to show they are qualified. *See* 42 U.S.C. §§ 12113(a)–(b); 29 C.F.R. Pt. 1630 app. § 1630.2(l). The Eighth Circuit recognizes a similar allocation of proof. In *EEOC v. Walmart Stores*, the employer argued, like here, that the disabled job applicant "would pose many safety risks if he was hired as a greeter or cashier." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 572 (8th Cir. 2007). The court did not address these arguments as a part of the "qualified individual" analysis. *See id.* at 569–70 (focusing on the applicant's training, experience, and current ability to perform the functions). Instead, the court analyzed the purported future harms in the context of the employer's direct threat defense, for which the employer had the burden of proof. *Id.* at 572. The court recognized an "individualized" direct threat analysis based on "the 'best current medical or other objective evidence' is intended 'protect disabled individuals from

27

discrimination based on prejudice, stereotypes, or unfounded fear.'" *Id.* at 571 (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999). To serve those statutory goals, it assigned the employer the burden of proving the employee posed a direct threat. *Id.* at 572. To disregard this, and instead address safety concerns at the qualified for the job stage, where Hurd bears the burden of proof, would allow U.P. to make an impermissible end run around its burden. So, consistent with Congress's intent, the Court will consider U.P.'s safety arguments in the context of the direct threat defense. *See Baker*, 580 F. Supp. 3d at 659 (reaching a similar conclusion).

In sum, there is a dispute of material fact about whether driving was an essential function of the chief utility clerk job, and the record evidence would allow a reasonable jury to conclude Hurd was qualified for the job.

### c. Cause

A reasonable jury could determine Hurd's perceived impairment caused U.P. to impose work restrictions. The Court approaches this as a direct evidence case and rejects U.P.'s invocation of the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). But, even applying *McDonnell Douglas*, disputes of material fact preclude summary judgment.

### i.    Legal framework

To recover under the ADA, Hurd must show that U.P. "discriminated" against him "on the basis of disability." 42 U.S.C. § 12112(a). More specifically, he must show "he . . . was subjected action prohibited under this Act *because of* an actual or perceived physical or mental impairment." *Id.* at § 12102(3)(A) (emphasis added). Cause in an ADA case can be shown directly or indirectly, using the *McDonnell Douglas* burden

shifting framework. *See Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021). The key question is not whether U.P. "was hostile toward disabled persons" but rather whether U.P. "was motivated by the employee's disability." *Sanders*, 108 F.4th at 1062.

### ii. A reasonable jury could conclude U.P. acted based on Hurd's perceived impairment

Here, there is sufficient evidence that U.P. acted because of a perceived impairment, specifically the damage to Hurd's brain. Hurd can show cause if "the defendant acknowledges relying on the plaintiff's [impairment] in reaching the employment decision." *Sanders*, 108 F.4th at 1062. For example, the employee in *Sanders* showed cause because U.P. "stopped Sanders from working as a foreman general because it believed he had diminished cardiovascular health." *Id.* at 1061. Same here. The FDD memo specifically identified Hurd's "chronic intracranial fluid collections (hygromas) and post-traumatic brain tissue loss in the left frontal lobe" and "intraparenchmal hemorrhages and resultant loss of brain tissue" as the reason for implementing work restrictions. As discussed *supra* Section A.1.a.ii., p. 17, these physical changes to the brain are impairments within the scope of the ADA's "regarded as" prong. So, cause is simple and "[Hurd] satisfie[s] the third element in this case because [U.P.] acknowledges relying on the plaintiff's [impairment] in reaching the employment decision." *Sanders*, 108 F.4th at 1062.

### iii. The *McDonnell-Douglas* burden shifting framework is inapplicable

Seeking to complicate matters, U.P. argues the Court must proceed under the *McDonnell Douglas* burden shifting framework. The Court disagrees.

*First*, U.P. repeats its arguments that it acted based on future risk not Hurd's impairment. The Court rejects that reasoning for the reasons discussed *supra* Section A.1.a.iii., p. 16.

*Second*, U.P. argues that there cannot be direct evidence because U.P. relied on Dr. Charbonneau's recommendations and there is no evidence "that discriminatory intent motivated Dr. Charbonneau rather than bona fide safety concerns. That presumption requires an inference—the antithesis of direct evidence." Filing No. 61 at 8. *Sanders* put that argument to bed, clarifying "while our cases have spoken in terms of 'discriminatory animus,' the ADA does not require evidence of prejudice toward the disabled. Rather, 'animus' in this context means simply that the employer was motivated by the employee's disability." 108 F.4th at 1062. Indeed, in the next sentence of their brief U.P. concedes "*[o]f course* Dr. Charbonneau considered the risks posed by Hurd's severe traumatic brain injury and hemorrhages. It was his job as an occupational physician, and it would have been irresponsible *not* to do so. Yet that is not equivalent to—or direct evidence of—an unlawful motive." Filing No. 61 at 8 (emphasis in original). Under the standard laid out in *Sanders*, it is enough that Hurd's impairment motivated the decision to impose work restrictions, and Hurd need not show any other type of illegal motive.

*Third*, U.P. argues finding direct evidence here would "upend the availability of fitness-for-duty evaluations, an ADA mainstay." But U.P. ignores the fact that it is more than welcome to act based on fitness-for-duty evaluations. For example, a fitness-for-duty examination may reveal a job applicant is unable to perform the functions of the job. *See e.g.*, *Clark*, 2008 WL 1733603, at *8. Or the fitness-for-duty evaluation could alert the employer to a safety risk related to an employee's disability or impairment that the

30

employer could act on so long as the decision is individualized, "based on the most current medical knowledge," and objectively reasonable. 29 C.F.R. § 1630.2(r). Indeed, the ADA gives U.P. *more* leeway to consider safety issues compared to other civil rights statutes because, by recognizing the direct threat defense, Congress decided in some circumstances, the employer is welcome to consider the employee's disability while making an employment decision. *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 350 (5th Cir. 2019) (Costa, J., specially concurring) ("Because some disabilities may prevent some people from performing some jobs safely, the ADA provides a defense if the disabled employee will pose a safety threat to himself or others . . . draw[ing] a line not between discrimination and its absence, but between unlawful and lawful discrimination."). Put another way, finding direct evidence here honors the bargain of the fitness-for-duty evaluation under the ADA: the employer can consider the employee's disability if they follow the substantive and procedural requirements that "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Walmart Stores*, 477 F.3d at 571. U.P. "cannot have it both ways by arguing that the" work restrictions were "justified because the disability was dangerous while also maintaining that the safety-threatening disability was not the reason for" imposing work restrictions. *Nall*, 917 F.3d at 350.

At bottom, the Court is unsure what applying the *McDonnell Douglas* framework would accomplish. The purpose of *McDonnell Douglas* is to "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). It is built out of the recognition that, "plaintiffs often face a paradox: Unless the employer is a latter-day George Washington, employment discrimination is as difficult to prove as who chopped down the cherry tree,

. . ., because employers of 'even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it . . ..'" *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1234 (11th Cir. 2019) (en banc) (Rosenbaum, J., dissenting). The framework is useful for "assur[ing] that the plaintiff [has] his day in court despite the unavailability of direct evidence." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 112 (1985) (second alteration in original) (internal quotations omitted). So, the burden shifting framework is very useful when the true motivation for the employment decision is unclear, the parties tell different stories, and the employer points to some other, nondiscriminatory motive for the action. *But see Nall*, 917 F.3d at 351 (Costa, J., concurring) ("As the judge-created doctrine has been widely criticized for its inefficiency and unfairness even in the space it is supposed to occupy —a tool for evaluating the sufficiency of circumstantial evidence—we should not expand it beyond those bounds."). For example, had U.P. completed the fitness-for-duty evaluation but, while Dr. Charbonneau was writing his report, fired Hurd for performance-based reasons, the *McDonnell Douglas* test would help the court sort out whether it was Hurd's impairment or performance motivated U.P.'s decision. But, here, U.P. wrote down that they were imposing work restrictions on Hurd because of seizure risk associated with his brain injury. Against that backdrop, applying *McDonnell Douglas* serves no real purpose. So, the Court concludes the *McDonnell Douglas* burden shifting framework is inapplicable and "like many ADA cases, the hard issue in this one is not whether there was discrimination but whether that discrimination was justified." *See Nall*, 917 F.3d at 350–52 (Costa, J., specially concurring) (collecting cases).

32

### iv. Even applying the *McDonnell-Douglas* burden shifting framework, U.P. is not entitled to summary judgment

In any event, even applying *McDonnell Douglas* burden shifting framework, U.P. is not entitled to summary judgment. Under the familiar standard, Hurd must make his prima facie case by showing: (1) he was regarded as disabled, (2) he was qualified for his position, and (3) U.P. imposed work restrictions under circumstances that give rise to an inference of unlawful discrimination. *Olsen v. Cap. Region Med. Ctr.*, 713 F.3d 1149, 1153–54 (8th Cir. 2013). Then, the burden shifts to U.P. to show a legitimate nondiscriminatory reason for imposing work restrictions. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). Then, the burden shifts back to Hurd to show that U.P.'s reasoning was pretextual, or that U.P.'s reason was wrong, and discrimination was the real reason. *Id.*

Hurd easily makes his prima facie case. As discussed, *supra* Section A.1.a., p. 16, a reasonable jury could conclude U.P. regarded Hurd as disabled. And as discussed *supra* Section A.1.b., p. 22, a reasonable jury could conclude Hurd was qualified to perform his job. As for indicia of cause, U.P. imposed work restrictions after Hurd suffered his head injury, citing risks stemming from that injury, and the FDD memo specifically identifies the lasting effects of Hurd's head injury as the reason for imposing work restrictions. This is sufficient to meet his prima facie case.

In response, U.P. proffers workplace safety as their legitimate nondiscriminatory reason. But the workplace safety concerns flow directly from Hurd's impairment. Therefore, the Court is dubious that U.P. has articulated a legitimate nondiscriminatory reason. *See* 29 C.F.R. Pt. 1630, App., § 1630.15(a) ("The crux of the defense to this type of charge is that the individual was treated differently not because of his or her disability

but for a legitimate nondiscriminatory reason such as poor performance *unrelated to the individual's disability*.") (emphasis added); *EEOC v. Drivers Mgmt., LLC*, No. 8:18-CV-462, 2023 WL 5627094, at *2 (D. Neb. Aug. 31, 2023) ("All of Werner's explanations are premised on Robinson's deafness, so his disability is the but-for cause of Werner's hiring decision as a matter of law."); *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084 (9th Cir. 2006) (making a similar point). This alone precludes summary judgment in U.P.'s favor, but even assuming U.P.'s safety concerns are legitimate and nondiscriminatory, Hurd has produced enough evidence to create a triable issue on pretext.

A reasonable jury could find that U.P.'s actions were pretextual. "Though the burden is on the plaintiff to provide evidence of pretext, to survive summary judgment she need not definitively prove that her employer's reason for firing her was pretextual—rather, she simply must adduc[e] enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive." *Anderson v. KAR Glob.*, 78 F.4th 1031, 1038 (8th Cir. 2023) (internal quotations omitted). Here, a reasonable jury could find that U.P.'s safety rationale was pretextual. Specifically, as discussed in more detail, *infra* Section A.2.b., pp. 38–39, if a jury credits the testimony that Hurd worked a desk job, they could reasonably conclude U.P.'s safety rationale has no basis in fact and U.P. acted based on imagined risks stemming from generalizations about brain injuries untethered to the realities of Hurd's job. Basically, the jury could conclude that U.P.'s safety judgment was wrong, and it acted based on "myths and fears about disability" instead. *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 284 (1987). So, even applying the *McDonnell Douglas* framework, U.P. is not entitled to summary judgment.

34

To summarize: a reasonable jury could find Hurd's impairment caused U.P. to take employment action because U.P. identified the lasting effects of Hurd's brain injury as a basis for imposing work restrictions. Even if framed as a case of indirect evidence, Hurd produced sufficient evidence of pretext to survive summary judgment.

\*       \*       \*

A jury could find Hurd's loss of brain tissue is an impairment, Hurd was qualified to be a Chief Utility Clerk, and U.P. imposed work restrictions because of Hurd's impairment. So U.P. is not entitled to summary judgment on Hurd's disparate treatment claim.

### 2.  U.P.'s Direct Threat Defense

There is sufficient evidence in the record for a reasonable jury to conclude U.P. did not meet its burden of showing Hurd was a "direct threat" to the safety of others.

The direct threat defense clarifies that the ADA does not require an employer to hire or continue to employ an employee who "pose[s] a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(a)–(b). But, because showing someone is a direct threat requires the employer to consider an employee's disability or impairment, Congress imposed guardrails to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Wal-Mart Stores*, 477 F.3d at 571. Specifically, to succeed on a direct threat defense U.P. must show that Hurd's condition created "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). The direct threat assessment must be "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job" and "a reasonable medical judgment that relies on the most current medical

knowledge and/or on the best available objective evidence." *Id.* In making this judgment, U.P. must have considered: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r). It is not enough for U.P. to show "slightly increased risk" or a "speculative or remote risk" when applying these factors. 29 C.F.R. § 1630.2(r). Instead, U.P. must show Hurd "poses a significant risk, i.e., high probability, of substantial harm." *Id.*

U.P. has the burden of proving Hurd posed a direct threat. *Wal-Mart Stores*, 477 F.3d at 571–72. "Whether one is a direct threat is a complicated, fact intensive determination, not a question of law. To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all the evidence about the nature of the risk and the potential harm." *Rizzo v. Children's World Learning Ctr.*, 84 F.3d 758, 764 (5th Cir. 1996); *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1278 (10th Cir. 2015) (same).

The record shows disputes of material facts on each element of U.P.'s direct threat defense that the Court cannot resolve on summary judgment.

### a. "Result of individualized assessment"

A reasonable jury could conclude that U.P. did not use an individual assessment to impose work restrictions because they did not account for the realities of the chief utility clerk role. An employer's direct threat determination must be based on "an individualized assessment of the individual's present ability to perform the essential functions." 29 C.F.R. § 1630.2(r). To make that determination, U.P. must "gather 'substantial information' about the employee's work history and medical status." *Nunes*, 164 F.3d at 1248 *cited*

36

with approval in *Wal-Mart Stores*, 477 F.3d at 571. Here, Dr. Charbonneau used the generic utility clerk job description to determine whether Hurd's essential functions created a risk to himself or others. Filing No. 75-11 at 14, Charbonneau Dep., 48:17–21. But evidence in the record suggests that the chief utility clerk was a desk job and Hurd did not drive as a part of his duties. Filing No. 63-22 at 26–27; Filing No. 75-2 at 10, Hurd Dep. at 33:18–19; *id.* at 38, Hurd Dep. at 144:6–14; *id.* at 13, Hurd Dep. at 43:11; *id.* at 14, Hurd Dep. at 46:3–4; *id.* at 21, Hurd Dep. at 76:18–77:5. Dr. Charbonneau did not reach out to Hurd or his supervisor to understand what Hurd's duties entailed. Filing No. 75-11, Charbonneau Dep. at 46:25–48:10. Crediting that evidence, a jury could conclude that U.P. relied on a generic description of a materially different job and did not conduct an individualized assessment of Hurd's work history.

This discrepancy between the description of the job relied on in U.P.'s evaluation and the realities of Hurd's job matters. Specifically, U.P. was required to assess "[t]he likelihood that the potential harm will occur" and "[t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r). If Hurd truly never drove or performed yard checks as a part of his job, any harm stemming from a potential seizure behind the wheel of a company van looks a lot less likely and a lot less imminent. Considering Hurd's account of his work could seizure-related harm from "a significant risk" to "speculative or remote risk." 29 C.F.R. § 1630.2(r). So, the dispute of material fact about the essential functions of the chief utility clerk role also operates as a dispute of material fact about whether U.P. engaged in an individualized assessment of Hurd's present ability to perform the essential functions of his job.

U.P. argues discrepancy does not matter but this argument does not carry the day. Specifically, it points to a line in Hurd's deposition where Hurd purportedly testified that he would be unable to perform the essential functions of his job with restrictions. However, the meaning of the cited testimony——"Q: And I understand you don't agree with these restrictions. I'm asking if you were restricted from working on or near moving trains, would you be able to perform all of your duties as a chief utility clerk? A: Obviously not. With the restriction of course not"——is ambiguous at best. Filing No. 75-2 at 38, Hurd Dep. at 144:18–24. Seconds earlier, Hurd testified he would be able to perform "all [his] job duties as chief utility clerk" if he was prohibited from "operat[ing] . . . company vehicles." Id., Hurd Dep. at 144:6–14. This is consistent with his testimony elsewhere. Filing No. 75-2 at 10, Hurd Dep. at 33:18–19; id. at 38, Hurd Dep. at 144:6–14; id. at 13, Hurd Dep. at 43:11; id. at 14, Hurd Dep. at 46:3–4; id. at 21, Hurd Dep. at 76:18–77:5. Based on the summary judgment record, the Court does not know of any job duties, besides driving, which involve being on or near trains. Indeed, Hurd's supervisor testified that Hurd did not perform any duties around the main line track. Filing No. 75-1 at 10, Barlow Dep. at 33:15–18. At best, this testimony creates an inconsistency that may impact Hurd's credibility, but credibility determinations are for the jury, not the Court on summary judgment.

### b. "Objectively reasonable" and "[b]ased on the most current medical knowledge and/or on the best available objective evidence"

A reasonable jury could conclude that U.P.'s decision to impose work restrictions was not objectively reasonable and "based on the most current medical knowledge and/or on the best available objective evidence." Sanders, 108 F.4th at 1062.

*First*, for the reasons stated *supra* Section A.2.a., pp. 36–38, a reasonable jury could conclude that U.P.'s direct threat determination was objectively unreasonable because Hurd's actual job responsibilities did not present the risks cited by U.P. Summary judgment on direct threat is inappropriate when there is a dispute of material fact about whether the Hurd "posed a significant, present threat to safety." *Baker*, 580 F. Supp. 3d at 660. Specifically, if the jury concludes Hurd did not drive and was highly unlikely to drive in the future, the safety rationale for Dr. Charbonneau's work restrictions vanishes. Against this backdrop, a reasonable jury could question U.P.'s reliance on the FMCSA handbook guidelines because the risk profile of a commercial trucker who sits behind the wheel of an eighteen-wheeler on the highway looks different from a clerical worker who sits behind a desk in an office near the railyard. So, even if the jury accepted U.P.'s medical evidence, it could reasonably conclude that the risk posed by Hurd's head injury to him and his coworkers was "speculative or remote." 29 C.F.R. § 1630.2(r).

*Second*, there is no guarantee a reasonable jury would accept U.P.'s medical evidence because other medical professionals, including those who treated Hurd, did not believe Hurd posed a seizure risk that was dangerous in the workplace. Summary judgment on direct threat is inappropriate when there is a dispute of material fact about "U.P.'s medical department's fitness for duty determination was reasonable in the face of contrary medical evidence." *Sanders v. Union Pac. R.R. Co.*, No. 4:20CV3023, 2021 WL 4783629, at *9 (D. Neb. Oct. 7, 2021) *aff'd* 108 F.4th 1055. For example, in *Sanders* the Eighth Circuit held U.P. "failed to prove that its decision was objectively reasonable" because plaintiff's expert testified U.P.'s "decision . . . was 'completely uncalled for, completely wrong, and not based on any medical principles at all.'" 108 F.4th at 1062.

Here, the physicians who treated Hurd's head injury, including the neurologist cleared him to return to work with no restrictions. Indeed, Dr. Trangle opined that U.P. substantially overstated the risk posed by Hurd by mis-categorizing his head injury and Hurd's seizure risk is near that of an average person. Filing No. 75-13 at 8. Of course, U.P.'s experts disagree but it is not the Court's role on summary judgment to weigh which physician opinions are more credible.

Overall, U.P. has not carried its burden on the "fact intensive determination" of whether Hurd posed a direct threat because the Court would need to sort out fact questions regarding the essential functions of Hurd's job and weigh the credibility and reasonableness of the medical experts. Rizzo, 84 F.3d at 764. Resolving these fact disputes is the jury's role, so summary judgment is not appropriate on U.P.'s direct threat defense.

### B. Hurd's Motion to Exclude, Filing No. 47

Hurd moves to exclude the testimony of Dr. Holland and Dr. Charbonneau because they failed to properly disclose their expert opinions under Fed. R. Civ. P. 26. The Court concludes Dr. Charbonneau's opinions were properly disclosed and, in any event, Hurd cannot show prejudice. The Court's resolution of Dr. Holland is more complicated. The Court finds Dr. Holland's testimony, regarding the design and purpose of the fitness-for-duty process, was adequately disclosed. But Dr. Holland's opinions regarding Hurd's case should have been disclosed via expert reports and the Court concludes tailored exclusion is the appropriate sanction.

#### 1. Dr. Charbonneau

The Court finds no basis to exclude or limit Dr. Charbonneau's testimony.

40

Dr. Charbonneau is properly characterized as hybrid witnesses or fact witnesses who possess specialized knowledge. Fed. R. Civ. P. 26(2)(B) only requires an expert report if "the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." "The distinguishing characteristic between expert opinions that require a report and those that do not is whether the opinion is based on information the expert witness acquired through percipient observations or whether, as in the case of retained experts, the opinion is based on information provided by others or in a manner other than by being a percipient witness to the events in issue." United States v. Sierra Pac. Indus., No. CIV S-09-2445 KJM EF, 2011 WL 2119078, at *4 (E.D. Cal. May 26, 2011) (E.D. Cal. May 26, 2011).[11] Here, Dr. Charbonneau is not a third-party expert retained for the purpose of this litigation and provided with materials to review. Rather, he is involved with this case because he was the U.P. physician who reviewed Hurd's case and imposed work restrictions. Certainly, he applied his medical knowledge when evaluating Hurd's records. But he learned the facts underlying his medical conclusions through "percipient observations" during the fitness-for-duty process, making him a hybrid witness. Sierra Pacific Industries, 2011 WL 2119078, at *4. Other courts faced with analogous witnesses

---

[11] Other district courts in the Eighth Circuit have relied on the Siera Pac. Indus. test to distinguish between a report-writing and non-report-writing expert after the 2010 Amendments to Rule 26. See e.g. City of Mankato, Minnesota v. Kimberly-Clark Corp., No. CV 15-2101 (JRT/TNL), 2019 WL 4897191, at *9 (D. Minn. May 28, 2019); Holladay v. Rockwell Collins, Inc., No. 317CV00078SMRSBJ, 2019 WL 11658792, at *2 (S.D. Iowa Feb. 14, 2019). This broader principle is consistent with the more granular rule about treating physicians articulated by the Eighth Circuit. See Johnson v. Friesen, 79 F.4th 939, 943 (8th Cir. 2023) ("Rather, we agree with the district court and the above-cited circuit court decisions 'that a treating physicians who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2).").

have reached the same conclusion.  *See e.g. Sierra Pacific Industries*, 2011 WL 2119078 at \*4 (fire investigators testifying to their observations and conclusions made during a fire investigation); *City of Mankato, Minnesota*, 2019 WL 4897191 at \*9 (an engineer testifying to in-house studies of the product at issue).  Thus, Dr. Charbonneau was properly categorized as a hybrid witness and the lower less intensive disclosure requirements of Fed. R. Civ. P. 26(a)(2)(C) apply.

U.P.'s expert disclosure complied with Rule 26.  Fed. R. 26(a)(2)(C) requires U.P. to disclose "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the witness is expected to testify."  Here, U.P.'s expert disclosures summarized the facts Dr. Charbonneau relied on.  *See* Filing No. 49-3 at 3 ("He is expected to testify regarding his knowledge of Union Pacific's fitness-for-duty policies and procedures as well as his involvement in the Plaintiff's fitness-for-duty evaluation, including his review of Plaintiff's medical records and health information consistent with his findings as stated in the Plaintiff's Medical Comments History and other documents produced in this case.").  The disclosure also pointed Hurd towards the opinions, Dr. Charbonneau would offer at trial.  *Id.* ("Dr. Charbonneau is also expected to testify regarding his diagnosis and opinions about Plaintiff's health condition, the restrictions placed upon Plaintiff by Union Pacific, and the underlying rationale for those restrictions.").  The disclosure refers to specific processes, records, and conclusions unique to this case and known to the parties, and is not "so generic, unhelpful, and boilerplate" that it "could apply to . . . virtually any case."  *Vincent v. Nelson*, 51 F.4th 1200, 1216 (10th Cir. 2022) (*quoting Torrez v. D. Las Vegas, Inc.*, 773 F. App'x 950, 951 (9th Cir. 2019).  Indeed, limiting Dr. Charbonneau's

testimony to sources cited in the FDD memo, as suggested by Hurd, would smuggle Fed. R. Civ. P. 26(2)(B)(i)'s requirement that a report writing expert provide "a complete statement of all opinions the witness will express and the basis and reasons for them" into Fed. R. Civ. P. 26(2)(C)(ii)'s facially less burdensome requirement of "a summary of the facts and opinions to which the witness is expected to testify." The rules committee intended for disclosure under Fed. R. 26(a)(2)(C) to be "considerably less extensive" and warned "[c]ourts must take care against requiring undue detail." Fed. R. Civ. P. 26 Advisory Committee's Notes to 2010 amendment. The Court heeds that warning and concludes U.P. complied with its disclosure obligations.

Even if disclosure was lacking, the Court would not exclude Dr. Charbonneau's testimony. "[E]xclusion of evidence is a harsh penalty and should be used sparingly." *Gruttemeyer*, 31 F.4th at 645. Before excluding evidence, the Court must consider "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Id.* at 644–45. Here, the surprise and prejudice prong cuts decisively against Hurd. Dr. Charbonneau's expert conclusions are the center of this lawsuit. Hurd knew from day one of this litigation that Dr. Charbonneau made the decision to impose work restrictions, received all the records associated with his opinion, deposed Dr. Charbonneau, and retained a responsive expert. There is no basis on the current record to conclude Hurd was prejudiced in any way, let alone sufficiently prejudiced to merit the harsh medicine of excluding evidence.[12]

---

[12] Of course, Dr. Charbonneau's testimony is limited to expert conclusions made during his review. *See Johnson*, 79 F.4th at 944. But Hurd has not proffered any conclusions that would be inadmissible on those grounds. If Dr. Charbonneau offers such a conclusion at trial, Hurd is welcome to object.

To summarize: Dr. Charbonneau is properly categorized as a hybrid witness and did not have to produce a report.  Instead, he is subject to the "less extensive" disclosure requirements under Fed. R. Civ. P. 26(a)(2)(C).  Hurd has not shown U.P.'s summary disclosure was deficient or any prejudice stemming from U.P.'s disclosure.  So, the Court declines to exclude or limit Dr. Charbonneau's testimony.

### 2.  Dr. Holland

The same goes for most of Dr. Holland's testimony, which involves fact testimony about the design and purpose of U.P.'s fitness-for-duty evaluations that he learned in his role as U.P.'s Chief Medical Officer.  He was a hybrid witness for the purpose of this testimony and U.P. made the necessary disclosures.  But the Court concludes that Dr. Holland's testimony regarding Hurd's medical records and fitness for duty fell outside the scope of his role as a hybrid witness.  Because that testimony was improperly disclosed, risks unfair surprise, and is duplicative of other expert testimony, the Court excludes the limited portion of Dr. Holland's testimony addressing Hurd's diagnosis and fitness for duty.

The bulk of Dr. Holland's testimony is subject to the Fed. R. Civ. P. 26(a)(2)(C) hybrid witness disclosure requirements.  As a reminder, the hybrid witness disclosure requirements apply when "the opinion is based on information the expert witness acquired through percipient observations."  Sierra Pacific Industries, 2011 WL 2119078, at *4.  Here, Dr. Holland worked as U.P.'s Chief Medical Officer.  In that role, he was responsible for the design and implementation of U.P.'s fitness-for-duty evaluations.  In making those design decisions, Dr. Holland relied on his medical expertise.  So, he is a hybrid witness who will explain to the jury how the fitness-for-duty evaluation works and the medical decisions underlying the design of the evaluations.  Put another way, his knowledge of

44

the fitness-for-duty system comes from personal experience not an after-the-fact review of the system. So, he qualifies as a hybrid witness.

U.P.'s expert disclosure on these topics complied with Fed. R. Civ. P. 26. Specifically, along with disclosures in U.P.'s expert disclosures providing "Dr. Holland is the former Chief Medical Officer of Union Pacific. He is expected to testify regarding his knowledge of Union Pacific's fitness-for-duty policies and procedures." Dr. Holland provided a declaration explaining the background of the fitness-for-duty policies and associated conclusions. Filing No. 62-1. So, the Court concludes Dr. Holland provided sufficient disclosures to testify about the background of the fitness-for-duty program, as well as its design, treatment of head injuries in general, and reliance on the FMCSA guidelines.

Dr. Holland's Hurd-specific conclusions are another story. While Fed. R. Civ. P. 26 mandates less extensive disclosures for a hybrid witness, it comes with an important caveat—without a report, the hybrid witness is limited to facts and conclusions they reached during their personal experience and cannot testify to later formed opinions. Johnson, 79 F.4th at 944. Caselaw is instructive. In Johnson, the plaintiff sought to introduce the testimony from the plaintiff's treating physician that the accident at issue caused plaintiff's damages. Id. at 942. The treating physician did not write an expert report but was disclosed as a hybrid witness. Id. at 943. The court held the treating physician ought to have provided an expert report because the physician did not form a causation opinion during treatment but instead formed the conclusion after reviewing medical records months later. Id. Here, Dr. Charbonneau was the primary decisionmaker in Hurd's case. Dr. Holland made no notes in Hurd's file, testified he did not "have any

independent recollection of this case," and did not recall any conversation with Dr. Charbonneau about Hurd's case. So, much like the treating physician in *Johnson* did not reach his causation opinion during treatment, Dr. Holland did not reach his opinion about Hurd's fitness for duty while serving as U.P.'s Chief Medical Officer. Instead, years later, after retiring, Dr. Holland reviewed Hurd's medical records and the expert reports in this litigation to form an opinion about how the fitness-for-duty policy applies to Hurd's case. For those conclusions, Dr. Holland is acting as a witness "retained or specially employed to provide expert testimony in the case" and ought to have provided an expert report. Fed. R. Civ. P. 26(a)(2)(B).

The Court concludes exclusion of the limited portion of Dr. Holland's opinion based on his later review of Hurd's records is the appropriate sanction. but the district court "has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case when a party fails to provide information or identify a witness in compliance with Rule 26(a)." *Gruttemeyer*, 31 F.4th at 645. The Court considers "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Id.* (quoting *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008)). The first factor favors exclusion because *Johnson*, issued seven months before the expert disclosure deadline, rendered U.P.'s basis for not providing an expert report legally dubious. *Compare Johnson*, 79 F.4th 939 with Filing No. 49 at 1 (setting the expert disclosure deadline for February 29, 2024). The second factor (surprise and prejudice) favors exclusion because nowhere in the record does Dr. Holland detail his expert conclusions about Hurd's case. Dr. Holland's name

does not appear in Hurd's records, he did not draft the FDD memo, and his summary judgment declaration does not make any conclusions regarding Hurd specifically. Effectively, Hurd is left guessing about Dr. Holland's specific conclusions. The third factor (impact on the order and efficiency of trial) is neutral because the Court believes it can efficiently manage trial with or without the testimony. The final factor (importance of the testimony) favors exclusion. Specifically, based on U.P.'s briefing, it appears that Dr. Holland's Hurd-focused testimony would be largely duplicative of the testimony of Dr. Charbonneau (the doctor who performed Hurd's fitness-for-duty evaluation) and Dr. Diesing (U.P.'s retained neurologists). So, the jury will have ample expert testimony evidence regarding Hurd's injury and seizure risk and the exclusion of a small subset of Dr. Holland's conclusions will not leave U.P. with a hole in its case. In sum, exclusion of the conclusions that ought to have been disclosed via expert report is a tailored sanction that corrects U.P.'s misunderstanding of its disclosure obligations, rectifies any unfair surprise to Hurd, but avoids hiding important information from the jury.

In sum, for most expert conclusions for which U.P. complied with its disclosure obligations, exclusion is not appropriate. But Dr. Holland's conclusions regarding Hurd's injuries and fitness for duty go beyond expert conclusions he formed during his employment and should have been disclosed by expert report under Fed. R. Civ. P. 26(2)(B). The Court finds exclusion of those those conclusions is an appropriate sanction.

### C. Hurd's Motion to Strike, Filing No. 69

Hurd moves to strike the proffered opinion testimony of Dr. Holland's testimony on two bases: (1) his opinion was not properly disclosed under Fed. R. Civ. P. 26, and (2) his opinion is inadmissible under Fed. R. Evid. 702. Hurd's current motion only seeks to

strike Dr. Holland's conclusions from the summary judgment record. But the Court concluded, after considering Dr. Holland's testimony, that U.P. is not entitled to summary judgment. *See supra* Section A., p. 15. So, Hurd's motion is moot. To the extent this is still a live issue after the Court's resolution of Hurd's Motion to Exclude, he may reraise the issue in a pre-trial *Daubert* motion or motion in limine.

**CONCLUSION**

There is sufficient evidence in the record to allow a jury to conclude that U.P. removed Hurd from service because of their perceptions of his brain injury and that that decision was not based on a direct threat to workplace safety. Hurd's motion to exclude based on Fed. R. Civ. P. 26 is well taken for some but not all of Dr. Holland's testimony and otherwise meritless. Hurd's motion to strike was rendered moot by the Court's summary judgment ruling.

**Therefore, IT IS ORDERED:**

1. U.P.'s Motion for Summary Judgment (Filing No. 58) is denied.

2. U.P.'s Motion for Judgment on the Pleadings (Filing No. 56) is granted in part and converted to a Motion for Summary Judgment and denied in part.

3. Hurd's Motion to Exclude (Filing No. 47) is granted in part as to Dr. Holland's conclusions about Hurd's fitness-for-duty and otherwise denied.

4. Hurd's Motion to Strike (Filing No. 69) is denied as moot, without prejudice to reassertion in a pre-trial motion.

Dated this 4th day of March, 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

48
